# UNITED STATES DISTRICT COURT

## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LABORERS' LOCAL #231 PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| RORY J. COWAN, EDWARD A. BLECHSCHMIDT, MICHAEL G. DALLAS, GUY L. de CHAZAL, SUSAN JANE KANTOR, PAUL A. KAVANAUGH, JACK NOONAN, JAMES A. QUELLA, CLAUDE P. SHEER, H.I.G. CAPITAL L.L.C., LBT ACQUISITION, INC., LBT MERGER SUB, INC. and LIONBRIDGE TECHNOLOGIES, INC., | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

ROBBINS GELLER RUDMAN
 & DOWD LLP
David T. Wissbroecker
655 West Broadway, Suite 1900
San Diego, CA 92101

ROBBINS GELLER RUDMAN
 & DOWD LLP
Christopher H. Lyons (#5493)
414 Union Street, Suite 900
Nashville, TN 37219

*Attorneys for Plaintiff*

ANDREWS & SPRINGER LLC
Peter B. Andrews (#4623)
Craig J. Springer (#5529)
David M. Sborz (#6203)
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807

## INTRODUCTION

1.      This is a class action brought on behalf of stockholders of Lionbridge Technologies, Inc. ("Lionbridge" or the "Company").  Lionbridge and an affiliate of private-equity firm H.I.G. Capital L.L.C.[1] engaged in a merger (the "Merger") in which Lionbridge stockholders received $5.75 per share in cash, and Lionbridge became a wholly owned subsidiary of HIG, under an Agreement and Plan of Merger dated December 12, 2016, by and among Lionbridge, LBT Acquisition, Inc., and LBT Merger Sub, Inc. (the "Merger Agreement").

2.      The Merger is a going-private buyout in which Lionbridge's CEO, Defendant Rory J. Cowan ("Cowan"), is participating with HIG to acquire the Company and run it as a private entity for his own benefit and that of HIG, without having to share the long-term fruits of the Company's promising prospects with its public stockholders.

3.      In their eagerness to encourage stockholders to accept the Merger, notwithstanding the inadequacy of the price offered, the defendants misled stockholders as to crucial information about the Company's prospects and value.  Defendant Cowan managed the Company, and plans to continue managing it, not solely to maximize short-term financial results at the Company's current scale, but to grow the Company substantially over the course of coming years.  While the Merger Agreement values the Company at about $356 million, Cowan managed the Company with plans to grow it fairly quickly to a $1 billion company and beyond.  A key way in which Cowan planned to achieve that goal was through acquisitions, which would accelerate the Company's growth and, once they were made and integrated, make the Company a highly profitable powerhouse.  Indeed, after the Merger, the

---

[1]      As used herein, "HIG" refers collectively to H.I.G. Capital LLC and its affiliates, including LBT Acquisition, Inc. and LBT Merger Sub, Inc.

Company demonstrated its commitment to this strategy, announcing a major acquisition just three days after the Merger closed.

4.     The problem here is that, in advocating the Merger, the defendants espoused financial projections that completely ignored these concrete business plans, and a valuation of the Company that was based on those projections.  That is, while the Company planned a series of acquisitions that would boost the Company's growth, earnings, and ultimate value, the defendants pitched the Merger as if stockholders were being asked to choose between accepting the $5.75 per share and holding shares in a standalone Company that would do nothing but muddle along with no growth through acquisitions.

5.     On January 31, 2017, defendants caused the Company to file with the U.S. Securities and Exchange Commission ("SEC") a Definitive Proxy Statement (the "Proxy Statement"), in which the members of the Company's board of directors (the "Board") recommended that stockholders vote their shares in favor of the Merger Agreement.  The Proxy Statement disclosed management projections that contemplated revenue growth over the next several years of less than 3.9% per year.  Those projections were inconsistent not only with the Company's average revenue growth of about 7% per year from 2011-2015, but also with the defendants' actual strategic plans for the Company.  By disclosing the false management projections, and valuations based on those projections, the defendants misled Lionbridge stockholders into voting in favor of the Merger.  The defendants knew that the projections were false because they had spoken on multiple occasions in the months leading up to the Merger about the Company's plans to continue growing through acquisitions, and they knew that the projections did not reflect those plans.

6.     As a result of these and other materially false and misleading statements contained in the Proxy Statement, defendants were able to obtain stockholder approval of the

sale of the Company to HIG and deprive Lionbridge stockholders of the full value of their interests in Lionbridge.  On February 28, 2017, a majority of Lionbridge stockholders voted in favor of the Merger Agreement.  Later that day, Lionbridge and HIG completed the Merger.  The preparation and dissemination of the false and misleading Proxy Statement thus induced stockholder action, which resulted in substantial harm to plaintiff and Lionbridge's other stockholders.  Meanwhile, the Merger benefitted Cowan because he was able to roll over a portion of his equity in the Company into equity in the post-Merger company, thus letting him share in the profits HIG will reap from buying the Company on the cheap.  It also benefitted all of the Individual Defendants because it enabled them to receive millions of dollars for otherwise-unvested equity awards, and to liquidate their otherwise illiquid holdings of Lionbridge stock.  The Board's financial advisor, Union Square Advisors LLC ("Union Square"), also benefitted because it received millions of dollars in fees, entirely contingent on the Merger, and also pleased its past and prospective clients Cowan and HIG, each of which have caused Union Square to receive millions of dollars of fees in the past and, Union Square hoped, will provide more such opportunities in the future.

7.      This action is brought against Lionbridge, certain of its senior officers and directors and its merger partners HIG arising out of defendants' dissemination of a materially false and misleading proxy statement in violation of §§14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and SEC Rule 14a-9 promulgated thereunder, 17 C.F.R. §240.14a-9.  Plaintiff seeks damages on behalf of itself and other former Lionbridge stockholders.

## JURISDICTION AND VENUE

8.      Pursuant to 28 U.S.C. §§1331 and 27 of the 1934 Act, this Court has jurisdiction over the claims arising under and pursuant to §14(a) and §20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder, 17 C.F.R. §240.14a-9.

9.      Venue is proper in this District pursuant to 28 U.S.C. §1391 and §27 of the 1934 Act because defendant Lionbridge is a Delaware corporation.  The Merger that is at issue in this action involved two Delaware corporations, and completion of the Merger required filing a certificate of merger in this District.  Lionbridge also has a forum-selection provision in its bylaws, adopted by the Individual Defendants, that specifies Delaware courts as the exclusive forum for certain legal actions involving the Company (including those for breach of fiduciary duty arising out of transactions like the Merger).

## PARTIES

10.     Plaintiff Laborers' Local #231 Pension Fund owned 4,170 shares of Lionbridge common stock before the Merger closed, and was entitled to vote at the Special Meeting on the Merger.  Plaintiff is a citizen of Illinois.

11.     Before the Merger, defendant Lionbridge was a citizen of Massachusetts as it was incorporated in Delaware and headquartered in Waltham, Massachusetts.  Lionbridge's common stock was listed on the NASDAQ under the ticker "LIOX."  Lionbridge considers itself the world's leading globalization company, providing translation and localization, digital marketing, global content management, and application testing services to the world's top brands.

12.     Defendant Rory J. Cowan ("Cowan") was Chairman of the Board, Chief Executive Officer, and President of the Company.  Cowan founded Lionbridge in September 1996, and continued to own over 18% of the equity at the time of the Company's 1999 initial

public offering ("IPO").  Cowan is identified in the Proxy Statement as a participant in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged herein.

13.     Defendant Edward A. Blechschmidt ("Blechschmidt") was a director of Lionbridge from February 2003 at least until closing of the Merger.  Blechschmidt is Chair of the Audit Committee.  Blechschmidt is identified in the Proxy Statement as a participant in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged herein.

14.     Defendant Michael G. Dallas ("Dallas") was a director of Lionbridge from October 2014 at least until closing of the Merger.  Dallas is identified in the Proxy Statement as a participant in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged herein.

15.     Defendant Guy L. de Chazal ("de Chazal") was a director of Lionbridge from February 1998, before the Company's IPO, at least until closing of the Merger.  At the time of the IPO, de Chazal was a member of the Company's then six-member board of directors and was employed by Morgan Stanley Dean Witter Venture Capital, owner of 33.4% of the Company's outstanding shares.  de Chazal is a member of the Audit Committee. de Chazal is identified in the Proxy Statement as a participant in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged herein.

16.     Defendant Susan Jane Kantor ("Kantor") was a director of Lionbridge from July 18, 2016 at least until closing of the Merger.  Most recently before her appointment, Kantor served as a National Advisory Partner at PricewaterhouseCoopers, which has been Lionbridge's auditor for over 18 years, and where Kantor was responsible for business development.

17.     Defendant Paul A. Kavanaugh ("Kavanaugh") was a director of Lionbridge from December 1996, before the Company's IPO, at least until closing of the Merger. Kavanaugh is a member of the Nominating and Compensation Committee.  At the time of Kavanaugh's election to the Board, Cowan and the venture capital fund that de Chazal represented collectively owned a majority of Lionbridge's outstanding shares and, thus, caused Kavanaugh's election to the Board.  Kavanaugh is identified in the Proxy Statement as a participant in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged herein.

18.     Defendant Jack Noonan ("Noonan") was a director of Lionbridge from April 2010 at least until closing of the Merger. Noonan is a member of the Audit Committee. Noonan is identified in the Proxy Statement as a participant in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged herein.

19.     Defendant James A. Quella ("Quella") was a director of Lionbridge from November 2015 at least until closing of the Merger. Quella is a member of the Nominating and Compensation Committee.  Quella is identified in the Proxy Statement as a participant in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged herein.

20.     Defendant Claude P. Sheer ("Sheer") was a director of Lionbridge from March 1999, before the Company's IPO, at least until closing of the Merger.  At the time of Sheer's election to the Board, Cowan and the venture capital fund that de Chazal represented collectively owned a majority of Lionbridge's outstanding shares and, thus, caused Sheer's election to the Board.  Sheer is the Chair of the Nominating and Compensation Committee. Sheer is identified in the Proxy Statement as a participant in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged herein.

21.    Defendants Cowan, Blechschmidt, Dallas, de Chazal, Kantor, Kavanaugh, Noonan, Quella, and Sheer are collectively referred to as "Individual Defendants" and/or the "Board."

22.    Defendant H.I.G. Capital L.L.C. ("H.I.G. Capital") is a Delaware limited liability company.  H.I.G. Capital describes itself as a global private equity investment firm that specializes in providing capital to small and medium-sized companies.  H.I.G. Capital controlled Parent and Merger Sub.

23.    Defendant LBT Acquisition, Inc. (referred to as "Parent" in the Proxy Statement) is a Delaware corporation.  Parent was formed solely in anticipation of the Merger by entities affiliated with H.I.G. Capital. Lionbridge is now a direct wholly-owned subsidiary of Parent.

24.    Defendant LBT Merger Sub, Inc. ("Merger Sub") was a Delaware corporation.  Merger Sub was formed by Parent solely for the purpose of acquiring Lionbridge and was a wholly-owned subsidiary of Parent.  At the closing of the Merger, Merger Sub merged with and into Lionbridge, and ceased to exist as a separate entity.

25.    Defendants H.I.G. Capital, Parent, and Merger Sub are collectively referred to herein as "HIG" or the "Buyer Defendants."  Under §6.04(b) of the Merger Agreement, the Buyer Defendants were required to, and did, cooperate with and assist the Company in connection with the preparation of the Proxy Statement.

26.    Each of the defendants participated in the preparation, review and dissemination of the materially false and misleading Proxy Statement complained of herein. The Individual Defendants abdicated their duty to file and distribute to plaintiff and the class a Proxy Statement that was not false and misleading.

## CLASS ACTION ALLEGATIONS

27.     Plaintiff's claims are brought on its own behalf and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all owners of Lionbridge common stock and their successors in interest, except defendants and their affiliates (the "Class").

28.     Plaintiff's claims are properly maintainable as a class action under Federal Rule of Civil Procedure 23.

29.     The Class is so numerous that joinder of all members is impracticable. According to the Proxy Statement, there were more than 61 million outstanding shares of common stock entitled to vote at the Special Meeting on the Merger.

30.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, but are not limited to, whether:

(a)     defendants violated §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 by preparing, reviewing and disseminating a false and misleading Proxy Statement; and

(b)     plaintiff and the other members of the Class have been damaged as a result of the conduct detailed herein.

31.     Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

32.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

33.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of

the Class which would establish incompatible standards of conduct for the party opposing the Class.

34.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

35.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## BACKGROUND OF THE MERGER

**The Cowan-Influenced Sales Process**

36.     In the first quarter of 2016, Lionbridge began to field inquiries from "financial sponsor parties," *i.e.*, private-equity firms, regarding a potential acquisition. Because this type of acquiror typically retains the target company's existing management team after acquiring the company, and provides them equity interests in the post-acquisition company (including by converting their existing equity into equity in the post-acquisition company), it was obvious to the Company's Board and its senior management team that members of management, and especially Cowan, would have a conflict of interest relating to any transaction with financial acquirors.

37.     Nevertheless, when the Board met in April 2016 to discuss the possibility of the Company being acquired and the Company's long-term plan and prospects, it was Cowan who provided the Board with projections for future revenues and earnings.  The Board apparently did not receive any independent input on the plan or the forecasts.  Instead, as it would continue to do throughout the process, it relied exclusively on Cowan and the obviously conflicted management team for information about the Company's prospects.

38.     A few months later, in July 2016, the Board established a special committee of purportedly independent directors, consisting of defendants de Chazal, Blechschmidt, and Sheer (the "Special Committee" or "Committee"), to consider a sale of the Company (or other alternatives), negotiate terms and make recommendations to the Board.  In reality, although the Special Committee's whole reason for existing was to protect the sales process from Cowan's conflict of interest with respect to any potential transaction with a financial acquiror, like HIG, the Special Committee was dominated by Cowan.  de Chazal, who was the chair of the Committee, and Sheer had been affiliated with Cowan for decades. At the time of Lionbridge's 1999 IPO, Cowan and the venture capital firm that de Chazal represented on Lionbridge's Board collectively owned a majority of the Company's outstanding shares.  Thus, Cowan and de Chazal could and did elect all of the other directors at the time, including Sheer.  Although Cowan was not a member of the Special Committee, he attended and participated in every single meeting held by the Special Committee.

39.     The sales process leading to the Merger was poisoned by the overarching presence of Cowan throughout.  Through de Chazal and Sheer, Cowan dominated the Special Committee, whose recommendations the Board reflexively followed.  And as both the Board and Special Committee were well aware from the commencement of the sales process, HIG and Party D were both clearly interested in the retention of Cowan and other members of executive management following the closing of the Merger.

40.     The extent of Cowan's conflict is made plain by the several instances in which both HIG and Party D expressed their desire to retain Cowan and other members of the Company's management after the Merger.  HIG's initial indication of interest, on July 22, 2016, stated that "as a financial investor H.I.G. relies on skilled management and accordingly its proposal assumed that [Lionbridge's] management would remain in place

following the closing." HIG's August 18, September 29, and November 15 proposals echoed this statement. Party D made similar overtures, stating in its written indication of interest on August 19 and again on September 21 that "one of the most attractive features of this transaction for Party D was the management team." At a November 22, 2016 meeting of the Special Committee, which Cowan attended, "[t]he Special Committee agreed that, if and when the parties came to an agreement on price, Mr. Cowan would be authorized to engage in high-level discussions with H.I.G. to understand H.I.G.'s general approach to retaining management teams in connection with its investments in or acquisitions of businesses." On December 2, Cowan and HIG engaged in these discussions, which confirmed Cowan's expectation that he would be treated well post-Merger.

41.    In spite of this clear indication of Cowan's conflict in relation to the transaction proposed by HIG, the Board never instructed Cowan to abstain from its discussions about the potential sale of the Company to HIG. Worse, the de Chazal-chaired Special Committee continued to invite Cowan into its deliberations about HIG and its offers, eviscerating the very independence the Special Committee was created to provide during the sales process. In fact, Cowan's access to the process at times exceeded even that of Special Committee members, not only in terms of representing the Company and its management in conversations with potential acquirors but also in terms of the Committee's decision-making process. On October 12, 2016, for example, it was de Chazal and Cowan, without any other Committee members present (but with the Committee's advisors), who decided to set an October 19 deadline for the confirmation of bids.

42.    On November 23, 2016, the Committee and HIG agreed to the terms of an exclusivity agreement under which Lionbridge would negotiate exclusively with HIG through December 11, 2016, to reach a definitive agreement providing for the acquisition of

Lionbridge by HIG at a price of $5.75 per share, subject to a "go-shop" period during which the Company could terminate the transaction in exchange for a reduced termination fee if it accepted a topping bid, although not if that bid came from a party that had been included in the sales process to date.  On December 11, 2016, the parties finalized that agreement, and the Board (with Cowan present but abstaining) voted to approve the Merger and the Merger Agreement.  The Merger was announced on December 12, 2016.  Stockholders voted to approve it on February 28, 2017, and it closed on the same day.

**The Conflicts of Interest that Tainted the Sales Process and Incentivized Defendants to Advocate the Merger**

43.     The conflicts and conduct that led to the announcement of the Merger raise substantial issues about the fairness of the consideration paid to Lionbridge's public stockholders and, more to the point, show the defendants' incentives to mislead the stockholders in order to lobby in favor of the Merger.

44.     First, Cowan and a Cowan family trust entered into letter agreements concurrent with the Merger Agreement, pursuant to which they, in the aggregate, contributed to HIG immediately prior to the Merger approximately 16.0% of the total number of shares of Lionbridge common stock owned by Cowan and his family trusts, amounting to approximately 2.0% of the total outstanding shares of Lionbridge common stock.  The rollover will allow Cowan to benefit as Lionbridge flourishes under HIG, while the Company's public stockholders – who did not have the opportunity to rollover 2% of their shares in the new entity – have been deprived of their Lionbridge equity and denied that special rollover benefit in return for the inadequate and unfair price of just $5.75 per share.

45.     Second, members of the Board and Company management, who collectively held another approximately 12.8% of Lionbridge's outstanding common stock, sought liquidity for their illiquid holdings in Lionbridge stock, and the Merger offered them that

significant liquidity.   When the Merger closed, members of the Board and Company management received over $40 million in cash from the deal.  Below is a table setting forth the value of these payments for each Individual Defendant:

| Name of Beneficial Owner | Shares Beneficially Owned | Payment for Shares Beneficially Owned |
|---|---|---|
| Rory J. Cowan[2] | 4,933,318 | $23,827,925.94 |
| Edward A. Blechschmidt | 171,094 | $983,790.50 |
| Michael G. Dallas | 41,505 | $238,653.75 |
| Guy L. de Chazal | 343,302 | $1,973,986.50 |
| Susan Kantor | 7,559 | $43,464.25 |
| Paul Kavanaugh | 112,081 | $644,465.75 |
| Jack Noonan | 86,624 | $498,088.00 |
| James A. Quella | 22,189 | $127,586.75 |
| Claude P. Sheer | 141,094 | $811,290.50 |
| All executive officers and directors as a group (13 persons) | 7,903,124 | $40,904,310.44 |

46.     Third, Lionbridge's officers and directors also received millions of dollars in special benefits – not given to ordinary stockholders – for unvested stock options and restricted stock units, which, upon the Merger's closing, became either fully vested and exercisable or rolled over into stock options or restricted stock units of the post-Merger company.  The value of these awards for each Individual Defendant is described in the table below:

| | Aggregate Vested Stock Option Payment ($) | Aggregate Unvested Stock Option Payment ($) | Aggregate Restricted Stock Unit Payment ($) | Aggregate Long-Term Incentive Performance Restricted Stock Payment ($) | Aggregate Restricted Stock Award Payment ($) | Total Equity Award Consideration ($) |
|---|---|---|---|---|---|---|
| Rory J. Cowan | 511,050 | 12,750 | — | 2,469,165 | 2,636,375 | 5,629,340 |
| Edward A. Blechschmidt | 572 | 7,294 | 40,819 | — | — | 48,685 |
| Michael G. Dallas | 24,972 | 7,294 | 40,819 | — | — | 73,085 |
| Guy L. de Chazal | 55,272 | 7,294 | 40,819 | — | — | 103,385 |
| Susan Jane Kantor | — | 30,635 | 43,464 | — | — | 74,099 |
| Paul Kavanaugh | 12,522 | 7,294 | 40,819 | — | — | 60,635 |
| Jack Noonan | 55,272 | 7,294 | 40,819 | — | — | 103,385 |
| James Quella | 4,031 | 10,753 | 40,819 | — | — | 55,603 |
| Claude Sheer | 39,872 | 7,294 | 40,819 | — | — | 87,985 |

---

[2]     The payment to Cowan reflects cash payment for only 84% of his shares, because 16% were converted into equity in the post-Merger entity.

47.     The Company's senior management was also entitled to receive from the Merger millions more in change-of-control payments.  The value of these payments are set forth below:

| Name | Cash ($) | Equity ($) | Perquisites/ Benefits ($) | Total ($) |
|------|------|------|------|------|
| Rory J. Cowan | 4,505,705 | 5,118,290 | 42,475 | 9,666,470 |
| Marc Litz | 829,994 | 637,531 | 6,077 | 1,189,649 |
| Marc Osofsky | 928,888 | 908,676 | 27,885 | 1,865,449 |
| Paula Shannon | 926,055 | 822,426 | 5,437(8) | 1,753,918 |
| Richard Tobin | 1,092,650 | 1,141,282 | 26,729 | 2,260,661 |

| Name | Cash Payable Pursuant to Single-Trigger Arrangements ($) | Cash Payable Pursuant to Double-Trigger Arrangements ($) |
|------|------|------|
| Rory J. Cowan | 639,404 | 3,866,301 |
| Marc Litz | 141,741 | 688,253 |
| Marc Osofsky | 126,285 | 802,603 |
| Paula Shannon | 136,192 | 789,863 |
| Richard Tobin | 200,869 | 891,781 |

48.     Furthermore, five of the nine Board members were also conflicted by their longstanding relationships with Cowan or the Company.  At the time of Lionbridge's 1999 IPO, de Chazal was a member of the Company's then six-member board of directors and was with Morgan Stanley Dean Witter Venture Capital, owner of 33.4% of the Company's outstanding shares.  At the time, Cowan owned 18.4% of Lionbridge's outstanding shares.  Thus, Cowan and de Chazal could and did elect all of the other directors at the time, including current Board members Kavanaugh and Sheer.  In addition, on July 12, 2016, the Company announced the appointment – by the Cowan and de Chazal dominated Board – of Susan Kantor to the Lionbridge Board of Directors.  Most recently, Kantor served as a National Advisory Partner at PricewaterhouseCoopers, which had been Lionbridge's auditor for over 18 years.

49.     Moreover, while Lionbridge's stockholders were cut out of the picture, the Company's management stayed on board after the transaction even as they cashed in their illiquid holdings for lucrative payouts.  As Cowan told Company employees following the

announcement of the Merger: "There will be very few changes.  I will remain as CEO and management, of course, will remain in place."  Consequently, in being retained by HIG, Lionbridge's management got the best of both worlds:  they could cash in or roll over their equity holdings, but also remain in their positions without being subject to the hassles and filing requirements of running a publicly traded company.  In essence, the Merger was a management buyout, backed by HIG.

50.     Finally, the Board retained a conflicted financial advisor.  During the two-year period before the date of the Merger Agreement, Union Square had provided financial advisory services to the Company (other than in connection with the proposed merger with HIG) and received a fee of approximately $1 million for those services.  Cowan was responsible for those engagements of Union Square, and Union Square had every incentive to maintain that strong relationship with Cowan going forward to secure future paydays.  During the same two-year period, Union Square has provided financial advisory services to HIG in connection with an unrelated acquisition transaction and received fees for these services of approximately $2 million.  Again, Union Square had a strong incentive to maintain its relationship with HIG after the Merger.

51.     In addition, Union Square was conflicted by the form of compensation agreed to here for its financial advisory services.  In return for serving as a financial advisor to the Board and rendering a fairness opinion, Union Square received a fee for its services of approximately $4.5 million, $600,000 of which was paid upon delivery of Union Square's opinion and the remainder of which was payable only upon the closing of the Merger.  Union Square was completely incentivized by the contingent nature of the fee to render, as it did, a favorable fairness opinion that the merger consideration was fair to Lionbridge's public stockholders.

**The Company's Acquisition-Based Growth Strategy**

52. Within a week of the announcement of the Merger, an interview with Cowan provided important insight into his plans for the Company. Cowan told a journalist from *Slator* that, after the Merger, Lionbridge was "'absolutely'" going to participate very actively in M&A. Cowan stressed that, as a private company, Lionbridge's ability to lever up its balance sheet would be enhanced. Cowan opined that the language services industry was "'entering an era of industry consolidation, as it bifurcates into very small local players and very large global players, and as in every other industry that mid-range tends to get hollowed out.'" Accordingly, he made a pitch to mid-sized language service providers that they should consider "'selling to a larger player that has already brought professional management, professional technology, and has global offices,'" like Lionbridge.

53. Cowan did not view the Company's acquisition-based growth strategy as a significant change from the way the Company had previously operated, telling employees after the announcement of the Merger that the Company's strategy would not significantly change: "[R]ather than having multiple investors, we will have a single investor. We'll no longer be in the public markets. We plan to operate substantially as we do today. There will be very few changes. I will remain as CEO and management, of course, will remain in place."

54. This focus on making acquisitions was consistent with sentiments Cowan and the rest of the Board had expressed in the months leading up to the Merger. For example, in an August 2016 interview, also with *Slator*, Cowan explained that Lionbridge's major reorganization into nine "Strategic Business Units" was necessary "to make Lionbridge a USD-1bn company in the coming years." He expounded that the new structure was intended to ease integration of future acquisitions: "'I now have places where I can plug in the

smaller acquisitions, and they can report to a GM for a faster integration that really aligns offerings, cost models, and the cultures."'  Even in the press release announcing Kantor's appointment to the Board, she hailed her anticipation that the Company would continue to "'evolve[] and broaden[] across new verticals, new markets and new channels.'"  In addition, on several occasions during the sales process, the Board or the Special Committee discussed that "access to capital to fund acquisitions" was one of the Company's "material execution risks."

**Defendants Disclosed Outcome-Driven Projections That Misled Stockholders by Ignoring The Company's Merger-led Growth Strategy**

55.     On January 31, 2017, Lionbridge filed the Proxy Statement with the SEC, in which the Board recommended that Lionbridge stockholders vote in favor of the Merger. The Proxy Statement materially misled Lionbridge stockholders, making the Merger seem more attractive than it really was.

56.     On pages 52-54 of the Proxy Statement, the defendants disclosed what they described as management financial projections.  The projections were described as "forecasts and assumptions for certain periods between 2016 and 2020" that "were developed under the assumption of continued standalone operation as a publicly-traded company and did not give effect to any changes or expenses as a result of the merger or any effects of the merger."  The projections included forecasts prepared by Lionbridge's management, including Cowan, for the full fiscal years 2016 and 2017, and "extrapolated projections for calendar years 2018 through 2020," which were prepared by the Company's financial advisors at Union Square and then "approved for use by senior management."  Collectively, defendants referred to the management-generated forecasts and the Union Square-generated extrapolations as the "Management Case" in the Proxy Statement.

57.     The projections disclosed in the Proxy Statement were as follows:

|  | 2016 Forecast | | 2017 Projection | | 2018 Projection | | 2019 Projection | | 2020 Projection |
|---|---|---|---|---|---|---|---|---|---|
| Revenue | $ | 550.5 | $ | 572.0 | $ | 606.5* | $ | 623.6* | $ | 641.2* |
| Adjusted EBITDA(1) | $ | 50.1 | $ | 60.1 | $ | 69.7* | $ | 75.5* | $ | 81.4* |
| GAAP Income from Operations | $ | 22.2 | $ | 32.7 | $ | 43.2* | $ | 49.6* | $ | 56.0* |
| Unlevered Free Cash Flow(2) | $ | 16.6 | $ | 20.4 | $ | 30.6* | $ | 34.3* | $ | 38.3* |

58.     As this table shows, these projections contemplated that, over four years, the Company's revenues would grow from $550.5 million only to $641.2, reflecting a compound annual growth rate of less than 3.9%.  By contrast, over the four years from 2011 to 2015, the Company had experienced compound annual revenue growth of nearly 7%.  Less than a year before the Merger was announced, Cowan had publicly discussed his intention to make Lionbridge a $1 billion company in the near future, largely through acquisitions.  The Merger, however, valued the Company at barely more than a third of that, meaning the acquisition-based growth strategy was expected to nearly triple the size of the Company. The management projections that were disclosed, because they do not reflect growth through acquisitions, are inconsistent with that strategy and with the resulting growth.

59.     By falsely assuming that the Company would simply proceed on a "standalone" basis without making any acquisitions, Defendants thus told stockholders that the Company would grow at an unrealistically low rate.  That was a material misstatement.

60.     That material misstatement, of course, enabled Union Square to perform financial analyses, based on the projections, that implied that the Merger price of $5.75 per share was within the range of fairness.  Had Union Square used projections that were consistent with the Company's actual strategy of growing through significant acquisitions, it likely would not have been able to opine that the Merger price was fair and, even if it did so opine, stockholders would not have been convinced and would not have supported the Merger.

**Immediately After the Merger, the Company
Continues Its Planned Streak of Acquisitions**

61.     Further confirming that the Company intended to continue pursuing growth

through acquisitions, it was just ***three days*** after the Merger closed that the now HIG-owned

Lionbridge announced its next acquisition.  On March 3, 2017, the Company announced the

acquisition of Exequo, a privately-held audio production, translation and localization

company that specializes in global video game services, with studios in five countries.

Although terms of the transaction were not disclosed, market observers noted that this

strengthened Lionbridge's position to compete in the video game localization market, where

the "much smaller" Keywords Studios has achieved a market capitalization of over $400

million on the London Stock Exchange.   Lionbridge's Vice President of Corporate

Development and Investor Relations stressed in an interview with *Slator* that the deal

"underscores H.I.G.'s support of Lionbridge's growth strategy."

62.     Given that it takes months for a transaction like this to be negotiated,

approved, and consummated, it is clear that the Individual Defendants knew of the planned

acquisition well before the Merger of Lionbridge was completed, and before the Proxy

Statement was filed with the SEC.  Nonetheless, stockholders were told nothing about this

acquisition in the Proxy Statement, and it was not reflected in the management projections

that were disclosed.

**Other Material Omissions from the Proxy Statement**

63.     Defendants also omitted several other pieces of material information, relating

to the Company's strategic plans and its management projections, from the Proxy Statement.

First, the Proxy Statement notes that on October 27, 2016, when the Board decided to

terminate its sales process, it was intent on pursuing a "long-term strategic plan," but fails to

identify that plan or provide any details about it, including any valuation analyses of or

financial projections relating to that "long-term strategic plan."  This omission is made particularly significant by the evidence that, as described above, the Company's long-term strategic plan was materially different from the plan reflected by the disclosed management projections, because it contemplated faster growth through acquisitions.  Failure to disclose an accurate description of the Company's long-term strategic plan and to compare that plan with the plan reflected in the management projections misled stockholders into believing that the long-term strategic plan was consistent with the management projections.

64.     Second, the Proxy Statement included a summary of Union Square's fairness analyses, but omitted key data and assumptions used in those analyses, including:

(a)     the EV/2016 adjusted EBITDA and EV/2017 adjusted EBITDA multiples for each of the selected companies observed by Union Square in its *Comparable Public Company Trading Analysis*;

(b)     whether Union Square performed any benchmarking analyses in its *Comparable Public Company Trading Analysis*;

(c)     of the four comparable company sets reviewed by Union Square in its *Comparable Public Company Trading Analysis*, the one deemed most comparable to Lionbridge;

(d)     the individual inputs and assumptions that Union Square used to derive the discount rate range of 12%-14% for Lionbridge in Union Square's *Discounted Cash Flow Analysis*;

(e)     the implied terminal EBITDA multiple range resulting from Union Square's *Discounted Cash Flow Analysis*;

(f)     how, if at all, Union Square incorporated Lionbridge's NOLs in its *Discounted Cash Flow Analysis*;

(g)      the net debt utilized by Union Square in its *Discounted Cash Flow Analysis*; and

(h)      the EV/LTM EBITDA and EV/NTM EBITDA multiples for each of the selected transactions analyzed by Union Square in its *Selected Precedent Transactions Analysis*.

65.      Third, even with respect to the management projections that were disclosed, critical elements of those projections were omitted from the Proxy, including the financial projections provided by Lionbridge management and relied upon by Union Square for purposes of its analysis, for the fourth quarter of 2016 and fiscal years 2017-2020, for the following items:

(a)      EBIT (or D&A);

(b)      Taxes (or tax rate);

(c)      Other expenses (net);

(d)      Cash restructuring charges and other charges;

(e)      Capital expenditures;

(f)      Changes in net working capital and other balance sheet accounts;

(g)      Stock-based compensation expense; and

(h)      Any other adjustments to unlevered free cash flow.

### COUNT I

**Against All Defendants
for Violations of §14(a) of the 1934 Act
and SEC Rule 14a-9 Promulgated Thereunder**

66.      Plaintiff repeats and realleges the allegations contained above in ¶¶1-65, as if fully set forth herein.

67.     SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the

Securities Exchange Act of 1934, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

68.     Defendants prepared, reviewed and/or disseminated the false and misleading

Proxy Statement which failed to disclose material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading.

69.     As stated herein, the Proxy Statement contained untrue statements of material

facts and omitted to state material facts necessary to make the statements that were made not

misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated

thereunder, which the Proxy Statement was an essential link in the consummation of the

Merger.  The defendants have also failed to correct the Proxy Statement and the failure to

update and correct false statements is also a violation of §14(a) of the 1934 Act and SEC

Rule 14a-9 promulgated thereunder.

70.     The written communications made by the defendants described herein

constitute violations of Rule 14a-9 and §14(a) because such communications are materially

false and/or misleading and were provided in at least a negligent manner.

71.     As a direct result of the defendants' negligent preparation, review and

dissemination of the false and/or misleading Proxy Statement, plaintiff and the class were

precluded both from exercising their right to seek appraisal and were induced to vote their

shares and accept inadequate consideration of $5.75 per share in connection with the Merger.

The false and/or misleading Proxy Statement used to obtain stockholder approval of the Merger deprived plaintiff and the class of their right to a fully informed stockholder vote in connection therewith and the full and fair value for their Lionbridge shares.  At all times relevant to the dissemination of the materially false and/or misleading Proxy Statement, defendants were aware of and/or had access to the true facts concerning Lionbridge's acquisition-based growth strategy, which was not reflected in the management projections that were disclosed in the Proxy Statement, and as a result were aware that Lionbridge's true value was materially higher than indicated in Union Square's financial analyses based on those projections and materially higher than the $5.75 per share that Lionbridge's stockholders received in the Merger.  Thus, as a direct and proximate result of the dissemination of the false and/or misleading Proxy Statement defendants used to obtain stockholder approval of and thereby consummate the Merger, Plaintiff and the class have suffered damage and actual economic losses (*i.e.*, the difference between the price Lionbridge stockholders received and Lionbridge's true value at the time of the Merger) in an amount to be determined at trial.

72.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder would have considered them important in deciding how to vote on the Merger.  In addition, a reasonable investor would view a full and accurate disclosure as having significantly altered the "total mix" of information made available in the Proxy Statement and in other information reasonably available to shareholders.

73.     By reason of the misconduct detailed herein, the defendants are liable pursuant to §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

## COUNT II

### Against the Individual Defendants and the Buyer Defendants
### for Violation of §20(a) of the 1934 Act

74.     Plaintiff repeats and realleges the allegations contained above in ¶¶1-65, as if fully set forth herein.

75.     The Individual Defendants acted as controlling persons of Lionbridge within the meaning of §20(a) of the 1934 Act.

(a)     By virtue of their positions as officers and/or directors and/or controlling stockholders of Lionbridge, and/or their participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

(b)     Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

(c)     The Proxy Statement details the Individual Defendants' involvement in negotiating, reviewing and approving the Merger and preparation of the Proxy Statement.

(d)     The Proxy Statement contains the unanimous recommendation of each of the Individual Defendants to approve the Merger.  They were thus directly involved in the making of this document.

(e)     By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the 1934 Act.

- 24 -

76.     The Buyer Defendants are a controlling person of Lionbridge and the Individual Defendants within the meaning of §20(a) of the 1934 Act.  By reason of its contractual obligations with Lionbridge, the Individual Defendants, and defendant Cowan in particular, the Buyer Defendants possessed control over Lionbridge and the Individual Defendants.

(a)     Lionbridge and the Individual Defendants were required by §6.01 of the Merger Agreement to refrain from changing the operation of the Company's business or engaging in a variety of activities without the express written consent of the Buyer Defendants.

(b)     Pursuant to §6.04(a) of the Merger Agreement, Lionbridge was not permitted to change the record date for the stockholder meeting on the Merger without the Buyer Defendants' prior written consent.

(c)     Pursuant to §6.04(b) of the Merger Agreement, the Buyer Defendants were required to, and did, "cooperate with the Company in connection with the preparation and filing of the Proxy Statement, including as promptly as practicable furnishing to the Company in writing upon request any and all information relating to it as may be required to be set forth in the Proxy Statement under Applicable Law."  HIG also promised to

> ensure that such information supplied by it in writing for inclusion in the Proxy Statement will not, on the date it is first mailed to stockholders of the Company and at the time of the Stockholder Meeting or filed with the SEC (as applicable), contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they are made, not false or misleading.

HIG also explicitly required that, "prior to filing or mailing the Proxy Statement or any other required filings (any amendment or supplement thereto), or responding to any comments of the SEC with respect thereto, the Company shall provide Parent and its counsel with a

reasonable opportunity to review and comment on such document or response and shall consider Parent's comments in good faith."

77.     By reason of such conduct, the Buyer Defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      Declaring that the Proxy Statement distributed by defendants to stockholders was materially false and misleading, in violation of Rule 14a-9 and §14(a) of the 1934 Act;

C.      Awarding Plaintiff and the members of the Class compensatory and/or rescissory damages against the defendants;

D.      Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs;

E.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, and any appropriate state law remedies; and

F.      Awarding such other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

OF COUNSEL:

**ROBBINS GELLER RUDMAN**
  **& DOWD LLP**
David T. Wissbroecker
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel.: (619) 231-1058

ROBBINS GELLER RUDMAN
  & DOWD LLP
Christopher H. Lyons (#5493)
414 Union Street, Suite 900
Nashville, TN  37219
Tel.:  (615) 244-2203

CAVANAGH & O'HARA
Patrick J. O'Hara
2319 West Jefferson Street
Springfield, IL  62702
Tel.: (217) 544-1771


Dated: April 27, 2017

**ANDREWS & SPRINGER LLC**

By: */s/ Peter B. Andrews*
Peter B. Andrews (#4623)
Craig J. Springer (#5529)
David M. Sborz (#6203)
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807
Tel.: (302) 504-4957

*Attorneys for Plaintiff*