# UNITED STATES DISTRICT COURT

## DISTRICT OF DELAWARE

| | |
|---|---|
| LABORERS' LOCAL #231 PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>RORY J. COWAN, EDWARD A. BLECHSCHMIDT, MICHAEL G. DALLAS, GUY L. de CHAZAL, SUSAN JANE KANTOR, PAUL A. KAVANAUGH, JACK NOONAN, JAMES A. QUELLA, CLAUDE P. SHEER, MARC LITZ, H.I.G. CAPITAL L.L.C., LBT ACQUISITION, INC., and LBT MERGER SUB, INC.,<br><br>Defendants. | C.A. No. 1:17-cv-00478-MAK<br><br><br><br>CLASS ACTION |

## SECOND AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

OF COUNSEL:

**ROBBINS GELLER RUDMAN**
**   & DOWD LLP**
Randall J. Baron
David T. Wissbroecker
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
         – and –
Christopher H. Lyons (#5493)
414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2203
615/252-3798 (fax)

*Lead Counsel for Plaintiff*

**ANDREWS & SPRINGER LLC**
Peter B. Andrews (#4623)
Craig J. Springer (#5529)
David M. Sborz (#6203)
3801 Kennett Pike Building C, Suite 305
Wilmington, DE  19807
Telephone:  302/504-4957
302/397-2681 (fax)
Email:  pandrews@andrewsspringer.com
          cspringer@andrewsspringer.com
          dsborz@andrewsspringer.com

*Local Counsel*

## INTRODUCTION

1.      This is a class action brought on behalf of former stockholders of Lionbridge Technologies, Inc. ("Lionbridge" or the "Company").  Lionbridge and an affiliate of private-equity firm HIG[1] engaged in a merger (the "Merger") in which Lionbridge stockholders received $5.75 per share in cash, and Lionbridge became a wholly owned subsidiary of HIG, under an Agreement and Plan of Merger dated December 12, 2016, by and among Lionbridge, LBT Acquisition, Inc., and LBT Merger Sub, Inc. (the "Merger Agreement").

2.      The Merger was effectively a going-private buyout in which Lionbridge's Chief Executive Officer ("CEO"), defendant Rory J. Cowan ("Cowan"), participated with HIG to acquire the Company and run it as a private entity for his own benefit and that of HIG, without having to share the long-term fruits of the Company's promising prospects with its public stockholders.

3.      In their eagerness to encourage stockholders to accept the Merger, notwithstanding the inadequacy of the price offered, the defendants misled stockholders as to crucial information about the Company's prospects and value.  Defendant Cowan managed the Company, and planned to continue managing it, not solely to maximize short-term financial results at the Company's current scale, but to grow the Company substantially over the course of coming years.  While the Merger Agreement valued the Company at about $356 million, Cowan managed the Company with plans to grow it fairly quickly to a $1 billion company and beyond.  A key way in which Cowan planned to achieve that goal was through acquisitions, which would accelerate the Company's growth and, once they were made and integrated, make the Company a highly profitable powerhouse.  Lionbridge's

---

[1]      As used herein, "HIG" refers collectively to H.I.G. Capital LLC and its affiliates, including LBT Acquisition, Inc. and LBT Merger Sub, Inc.

Board of Directors (the "Board" or "Individual Defendants") repeatedly discussed this strategy before and throughout the process that led to the Merger. Indeed, after the Merger, the Company demonstrated its commitment to this strategy, announcing a major acquisition just three days after the Merger closed.

4.      The problem here is that, in advocating the Merger, the defendants espoused financial projections that completely ignored these concrete business plans, and a valuation of the Company that was based on those projections. That is, while the Company planned a series of acquisitions that would boost the Company's growth, earnings, and ultimate value (including at least one significant acquisition that was all but finalized by the time the stockholders voted), defendants pitched the Merger as if stockholders were being asked to choose between accepting the $5.75 per share and holding shares in a standalone Company that would do nothing but muddle along with no growth through acquisitions.

5.      On January 31, 2017, defendants caused the Company to file with the U.S. Securities and Exchange Commission ("SEC") a Definitive Proxy Statement (the "Proxy Statement"), in which the members of the Company's Board recommended that stockholders vote their shares in favor of the Merger Agreement. The Proxy Statement disclosed management projections that contemplated revenue growth over the next several years of less than 3.9% per year. Those projections were inconsistent not only with the Company's average revenue growth of about 7% per year from 2011-2015, but also with defendants' actual strategic plans for the Company. By disclosing only the management projections, and valuations based on those projections, Lionbridge stockholders were misled into voting in favor of the Merger. The defendants knew that the projections did not represent the operative reality of the Company because they had spoken on multiple occasions, in the

months leading up to the Merger about the Company's plans to continue growing through acquisitions, and they knew that the projections did not reflect those plans.

6.    When stockholders are forced to decide whether to accept a certain value in a cash-out merger, there is no more material information than management's estimates of the standalone corporation's future cash flows.  In such a situation, investors are concerned, perhaps above all else, with the expected corporate cash flows if the sale is not approved.  A common refrain throughout case law states that "projections . . . are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or . . . market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects."  For these reasons, under the federal securities laws, corporate directors are obligated to provide an honest and untainted summary and description of projected future cash flows.

7.    Here, however, the Individual Defendants disclosed projected cash flows that did not reflect their own true expectations for the Company's future earnings, because the projections were based on the incorrect assumption that the Company would abandon its acquisition-based growth strategy.   Indeed, the Individual Defendants have now (in connection with briefing a motion to dismiss in this action) explicitly admitted that the projections "did not include opportunities for upside such as acquisitions" and that "the forecasts did not include future acquisitions."

8.    The Proxy Statement omitted to disclose this crucial fact.  That omission rendered materially misleading several statements in that document that conveyed to shareholders the understanding that the Board and Lionbridge management believed the disclosed projections were reliable and reasonable, and reflective of the Company's actual business strategies and prospects.  For example, the omission rendered misleading the

Board's recommendation that shareholders vote to approve the Acquisition, since that recommendation rested on projections and a financial analysis that, unbeknownst to shareholders, did not reflect the Company's actual business strategy. As a result of the omission, the Individual Defendants misled stockholders in their attempt to make the undervalued Merger appear fair.

9.      As a result of the materially misleading statements contained in the Proxy Statement, defendants were able to obtain shareholder approval of the sale of the Company to HIG and deprive Lionbridge stockholders of the full value of their interests in Lionbridge. On February 28, 2017, a majority of Lionbridge stockholders voted in favor of the Merger Agreement. Later that day, Lionbridge and HIG completed the Merger. The preparation and dissemination of the materially misleading Proxy Statement thus induced stockholder action which resulted in substantial harm to plaintiff and Lionbridge's other stockholders. Meanwhile, the Merger benefitted Cowan because he was able to roll over a portion of his equity in the Company into equity in the post-Merger company, thus letting him share in the profits HIG will reap from buying the Company on the cheap. It also benefitted all of the Individual Defendants because it enabled them to receive millions of dollars for otherwise-unvested equity awards, and to liquidate their otherwise illiquid holdings of Lionbridge stock. The Board's financial advisor, Union Square Advisors LLC ("Union Square"), also benefitted because it received millions of dollars in fees, entirely contingent on the Merger, and also pleased its past and prospective clients Cowan and HIG, each of which have caused Union Square to receive millions of dollars of fees in the past and, as Union Square hoped, will provide more such opportunities in the future.

10.     This action is brought against Lionbridge, certain of its senior officers and directors and its merger partners HIG arising out of defendants' dissemination of a materially

misleading proxy statement in violation of §§14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and SEC Rule 14a-9 promulgated thereunder, 17 C.F.R. §240.14a-9. Plaintiff seeks damages on behalf of itself and other former Lionbridge shareholders.

## JURISDICTION AND VENUE

11.     Pursuant to 28 U.S.C. §§1331 and 27 of the 1934 Act, this Court has jurisdiction over the claims arising under and pursuant to §14(a) and §20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder, 17 C.F.R. §240.14a-9.

12.     Venue is proper in this District pursuant to 28 U.S.C. §1391 and §27 of the 1934 Act because defendant Lionbridge is a Delaware corporation. The Merger that is at issue in this action involved two Delaware corporations, and completion of the Merger required filing a certificate of merger in this District. Lionbridge also has a forum-selection provision in its bylaws, adopted by the Individual Defendants, that specifies Delaware courts as the exclusive forum for certain legal actions involving the Company (including those for breach of fiduciary duty arising out of transactions like the Merger).

## PARTIES

13.     Plaintiff Laborers' Local #231 Pension Fund owned 4,170 shares of Lionbridge common stock before the Merger closed, and was entitled to vote at the Special Meeting on the Merger. Plaintiff is a citizen of Illinois.

14.     Before the Merger, defendant Lionbridge was a citizen of Massachusetts as it was incorporated in Delaware and headquartered in Waltham, Massachusetts. Lionbridge's common stock was listed on the NASDAQ under the ticker "LIOX." Lionbridge considers itself the world's leading globalization company, providing translation and localization, digital marketing, global content management, and application testing services to the world's top brands.

15.     Defendant Cowan was Chairman of the Board, CEO, and President of the Company at least until closing of the Merger.  Cowan founded Lionbridge in September 1996, and continued to own over 18% of the equity at the time of the Company's 1999 initial public offering ("IPO").  Cowan is identified in the Proxy Statement as a participant in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged herein.

16.     Defendant Edward A. Blechschmidt ("Blechschmidt") was a director of Lionbridge from February 2003 at least until closing of the Merger.  Blechschmidt is Chair of the Audit Committee.  Blechschmidt is identified in the Proxy Statement as a participant in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged herein.

17.     Defendant Michael G. Dallas ("Dallas") was a director of Lionbridge from October 2014 at least until closing of the Merger.  Dallas is identified in the Proxy Statement as a participant in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged herein.

18.     Defendant Guy L. de Chazal ("de Chazal") was a director of Lionbridge from February 1998, before the Company's IPO, at least until closing of the Merger.  At the time of the IPO, de Chazal was a member of the Company's then six-member board of directors and was employed by Morgan Stanley Dean Witter Venture Capital, owner of 33.4% of the Company's outstanding shares.  de Chazal is a member of the Audit Committee.  de Chazal is identified in the Proxy Statement as a participant in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged herein.

19.     Defendant Susan Jane Kantor ("Kantor") was a director of Lionbridge from July 18, 2016 at least until closing of the Merger.  Most recently before her appointment,

Kantor served as a National Advisory Partner at PricewaterhouseCoopers, which has been Lionbridge's auditor for over 18 years, and where Kantor was responsible for business development. Kantor is identified in the Proxy Statement as a participant in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged herein.

20.     Defendant Paul A. Kavanaugh ("Kavanaugh") was a director of Lionbridge from December 1996, before the Company's IPO, at least until closing of the Merger. Kavanaugh is a member of the Nominating and Compensation Committee. At the time of Kavanaugh's election to the Board, Cowan and the venture capital fund that de Chazal represented collectively owned a majority of Lionbridge's outstanding shares and, thus, caused Kavanaugh's election to the Board. Kavanaugh is identified in the Proxy Statement as a participant in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged herein.

21.     Defendant Jack Noonan ("Noonan") was a director of Lionbridge from April 2010 at least until closing of the Merger. Noonan is a member of the Audit Committee. Noonan is identified in the Proxy Statement as a participant in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged herein.

22.     Defendant James A. Quella ("Quella") was a director of Lionbridge from November 2015 at least until closing of the Merger. Quella is a member of the Nominating and Compensation Committee. Quella is identified in the Proxy Statement as a participant in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged herein.

23.     Defendant Claude P. Sheer ("Sheer") was a director of Lionbridge from March 1999, before the Company's IPO, at least until closing of the Merger. At the time of Sheer's election to the Board, Cowan and the venture capital fund that de Chazal represented

collectively owned a majority of Lionbridge's outstanding shares and, thus, caused Sheer's election to the Board.  Sheer is the Chair of the Nominating and Compensation Committee. Sheer is identified in the Proxy Statement as a participant in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged herein.

24.     Defendant Marc Litz ("Litz") was Senior Vice President Finance and Chief Financial Officer of Lionbridge from November 2015 at least until closing of the Merger. Litz joined the Company in August 2012.  On information and belief, Litz provided material information for inclusion in the Proxy Statement and thus directly participated in the wrongdoing alleged herein, including by working with Cowan to prepare the management financial projections that were disclosed in the Proxy Statement.

25.     Defendants Cowan, Blechschmidt, Dallas, de Chazal, Kantor, Kavanaugh, Noonan, Quella, and Sheer are collectively referred to as the "Board."  Defendants Cowan, Blechschmidt, Dallas, de Chazal, Kantor, Kavanaugh, Noonan, Quella, Sheer, and Litz are collectively referred to as the Individual Defendants.

26.     Defendant HIG Capital LLC ("H.I.G. Capital") is a Delaware limited liability company.  H.I.G. Capital describes itself as a global private equity investment firm that specializes in providing capital to small and medium-sized companies.  H.I.G. Capital controlled Parent and Merger Sub.

27.     Defendant LBT Acquisition, Inc. (referred to as "Parent" in the Proxy Statement) is a Delaware corporation.  Parent was formed solely in anticipation of the Merger by entities affiliated with H.I.G. Capital.  Upon completion of the Merger, Lionbridge will be a direct wholly-owned subsidiary of Parent.

28.     Defendant LBT Merger Sub, Inc. ("Merger Sub") was a Delaware corporation.  Merger Sub was formed by Parent solely for the purpose of acquiring

Lionbridge and was a wholly-owned subsidiary of Parent. Upon completion of the Merger, Merger Sub merged with and into Lionbridge, and ceased to exist as a separate entity.

29.     Defendants H.I.G. Capital, Parent, and Merger Sub are collectively referred to herein as "HIG" or the "Buyer Defendants."  Under §6.04(b) of the Merger Agreement, the Buyer Defendants were required to, and did, cooperate with and assist the Company in connection with the preparation of the Proxy Statement.

30.     Each of the defendants participated in the preparation, review and dissemination of the materially misleading Proxy Statement complained of herein.  The Individual Defendants abdicated their duty to file and distribute to plaintiff and the class a Proxy Statement that was not misleading.

## CLASS ACTION ALLEGATIONS

31.     Plaintiff's claims are brought on its own behalf and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all owners of Lionbridge common stock and their successors in interest, except defendants and their affiliates (the "Class").

32.     Plaintiff's claims are properly maintainable as a class action under Federal Rule of Civil Procedure 23.

33.     The Class is so numerous that joinder of all members is impracticable. According to the Proxy Statement, there were more than 61 million outstanding shares of common stock entitled to vote at the Special Meeting on the Merger.

34.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, but are not limited to, whether:

(a)     defendants violated §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 by preparing, reviewing and disseminating a misleading Proxy Statement; and

(b)    plaintiff and the other members of the Class have been damaged as a result of the conduct detailed herein.

35.    Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

36.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

37.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

38.    Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

39.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## BACKGROUND OF THE MERGER

**The Cowan-Influenced Sales Process**

40.    In the first quarter of 2016, Lionbridge began to field inquiries from "financial sponsor parties," *i.e.*, private-equity firms, regarding a potential acquisition. Because this type of acquiror typically retains the target company's existing management team after acquiring the company, and provides them equity interests in the post-acquisition company (including by converting their existing equity into equity in the post-acquisition

company), it was obvious to the Company's Board and its senior management team that members of management, and especially Cowan, would have a conflict of interest relating to any transaction with financial acquirors.

41.     Nevertheless, when the Board met in April 2016 to discuss the possibility of the Company being acquired and the Company's long-term plan and prospects, it was Cowan who provided the Board with projections for future revenues and earnings.  The Board apparently did not receive any independent input on the plan or the forecasts.  Instead, as it would continue to do throughout the process, it relied exclusively on Cowan and the obviously conflicted management team for information about the Company's prospects.

42.     A few months later, in July 2016, the Board established a special committee of purportedly independent directors, consisting of defendants de Chazal, Blechschmidt, and Sheer (the "Special Committee"), to consider a sale of the Company (or other alternatives), negotiate terms and make recommendations to the Board.  In reality, although the Special Committee's whole reason for existing was to protect the sales process from Cowan's conflict of interest with respect to any potential transaction with a financial acquiror, like HIG, the Special Committee was dominated by Cowan.  de Chazal, who was the chair of the Committee, and Sheer had been affiliated with Cowan for decades. At the time of Lionbridge's 1999 IPO, Cowan and the venture capital firm that de Chazal represented on Lionbridge's Board collectively owned a majority of the Company's outstanding shares. Thus, Cowan and de Chazal could and did elect all of the other directors at the time, including Sheer.  Although Cowan was not a member of the Special Committee, he attended and participated in every single one of its meetings.

43.     The sales process leading to the Merger was poisoned by the overarching presence of Cowan throughout.  Through de Chazal and Sheer, Cowan dominated the

Special Committee, whose recommendations the Board reflexively followed.  And as both the Board and Special Committee were well aware from the commencement of the sales process, HIG and Party D were both clearly interested in the retention of Cowan and other members of executive management following the closing of the Merger.

44.     The extent of Cowan's conflict is made plain by the several instances in which both HIG and Party D expressed their desire to retain Cowan and other members of the Company's management after the Merger.  HIG's initial indication of interest, on July 22, 2016, stated that "as a financial investor H.I.G. relies on skilled management and accordingly its proposal assumed that [Lionbridge's] management would remain in place following the closing."  HIG's August 18, September 29, and November 15 proposals echoed this statement.  Party D made similar overtures, stating in its written indication of interest on August 19 and again on September 21 that "one of the most attractive features of this transaction for Party D was the management team."  At a November 22, 2016 meeting of the Special Committee, which Cowan attended, "[t]he Special Committee agreed that, if and when the parties came to an agreement on price, Mr. Cowan would be authorized to engage in high-level discussions with H.I.G. to understand H.I.G.'s general approach to retaining management teams in connection with its investments in or acquisitions of businesses."  On December 2, Cowan and HIG engaged in these discussions, which confirmed Cowan's expectation that he would be treated well post-Merger.

45.     In spite of this clear indication of Cowan's conflict in relation to the transaction proposed by HIG, the Board never instructed Cowan to abstain from its discussions about the potential sale of the Company to HIG.  Worse, the de Chazal-chaired Special Committee continued to invite Cowan into its deliberations about HIG and its offers. In fact, Cowan's access to the process at times exceeded even that of Special Committee

members, not only in terms of representing the Company and its management in conversations with potential acquirors but also in terms of the Special Committee's decision-making process. On October 12, 2016, for example, it was de Chazal and Cowan, without any other Special Committee members present (but with the Committee's advisors), who decided to set an October 19 deadline for the confirmation of bids.

46.    On November 23, 2016, the Special Committee and HIG agreed to the terms of an exclusivity agreement under which Lionbridge would negotiate exclusively with HIG through December 11, 2016, to reach a definitive agreement providing for the acquisition of Lionbridge by HIG at a price of $5.75 per share, subject to a "go-shop" period during which the Company could terminate the transaction in exchange for a reduced termination fee if it accepted a topping bid, although not if that bid came from a party that had been included in the sales process to date. On December 11, 2016, the parties finalized that agreement, and the Board (with Cowan present but abstaining) voted to approve the Merger and the Merger Agreement. The Merger was announced on December 12, 2016. Stockholders voted to approve it on February 28, 2017, and it closed on the same day.

**The Conflicts of Interest that Tainted the Sales Process and Incentivized Defendants to Advocate the Merger**

47.    The conflicts and conduct that led to the announcement of the Merger raise substantial issues about the fairness of the consideration paid to Lionbridge's public stockholders and, more to the point, show the defendants' incentives to mislead stockholders in order to lobby in favor of the Merger.

48.    First, Cowan and a Cowan family trust entered into letter agreements concurrent with the Merger Agreement, pursuant to which they, in the aggregate, contributed to HIG immediately prior to the Merger approximately 16.0% of the total number of shares of Lionbridge common stock owned by Cowan and his family trusts, amounting to

approximately 2.0% of the total outstanding shares of Lionbridge common stock.  The rollover will allow Cowan to benefit as Lionbridge flourishes under HIG, while the Company's public stockholders – who did not have the opportunity to rollover any of their shares in the new entity – have been deprived of their Lionbridge equity and denied that special rollover benefit in return for the inadequate and unfair price of just $5.75 per share.

49.     Second, members of the Board and Company management, who collectively held another approximately 12.8% of Lionbridge's outstanding common stock, sought liquidity for their illiquid holdings in Lionbridge stock, and the Merger offered them that significant liquidity.  When the Merger closed, members of the Board and Company management received over $40 million in cash from the deal.  Below is a table setting forth the value of these payments for each Individual Defendant:

| Name of Beneficial Owner | Shares Beneficially Owned | Payment for Shares Beneficially Owned |
|---|---|---|
| Rory J. Cowan[2] | 4,933,318 | $23,827,925.94 |
| Edward A. Blechschmidt | 171,094 | $983,790.50 |
| Michael G. Dallas | 41,505 | $238,653.75 |
| Guy L. de Chazal | 343,302 | $1,973,986.50 |
| Susan Kantor | 7,559 | $43,464.25 |
| Paul Kavanaugh | 112,081 | $644,465.75 |
| Jack Noonan | 86,624 | $498,088.00 |
| James A. Quella | 22,189 | $127,586.75 |
| Claude P. Sheer | 141,094 | $811,290.50 |
| All executive officers and directors as a group (13 persons) | 7,903,124 | $40,904,310.44 |

50.     Third, Lionbridge's officers and directors also received millions of dollars in special benefits – not given to ordinary stockholders – for unvested stock options and restricted stock units, which, upon the Merger's closing, became either fully vested and exercisable or rolled over into stock options or restricted stock units of the post-Merger

---

[2]     The payment to Cowan reflects cash payment for only 84% of his shares, because 16% were converted into equity in the post-Merger entity.

company.  The value of these awards for each Individual Defendant is described in the table below:

| | Aggregate Vested Stock Option Payment ($) | Aggregate Unvested Stock Option Payment ($)) | Aggregate Restricted Stock Unit Payment ($) | Aggregate Long-Term Incentive Performance Restricted Stock Payment ($) | Aggregate Restricted Stock Award Payment ($) | Total Equity Award Consideration ($) |
|---|---|---|---|---|---|---|
| Rory J. Cowan | 511,050 | 12,750 | — | 2,469,165 | 2,636,375 | 5,629,340 |
| Edward A. Blechschmidt | 572 | 7,294 | 40,819 | — | — | 48,685 |
| Michael G. Dallas | 24,972 | 7,294 | 40,819 | — | — | 73,085 |
| Guy L. de Chazal | 55,272 | 7,294 | 40,819 | — | — | 103,385 |
| Susan Jane Kantor | — | 30,635 | 43,464 | — | — | 74,099 |
| Paul Kavanaugh | 12,522 | 7,294 | 40,819 | — | — | 60,635 |
| Jack Noonan | 55,272 | 7,294 | 40,819 | — | — | 103,385 |
| James Quella | 4,031 | 10,753 | 40,819 | — | — | 55,603 |
| Claude Sheer | 39,872 | 7,294 | 40,819 | — | — | 87,985 |

51.    The Company's senior management also received from the Merger millions more in change-of-control payments.  The value of these payments are set forth below:

| Name | Cash ($) | Equity ($) | Perquisites/ Benefits ($) | Total ($) |
|---|---|---|---|---|
| Rory J. Cowan | 4,505,705 | 5,118,290 | 42,475 | 9,666,470 |
| Marc Litz | 829,994 | 637,531 | 6,077 | 1,189,649 |
| Marc Osofsky | 928,888 | 908,676 | 27,885 | 1,865,449 |
| Paula Shannon | 926,055 | 822,426 | 5,437(8) | 1,753,918 |
| Richard Tobin | 1,092,650 | 1,141,282 | 26,729 | 2,260,661 |

| Name | Cash Payable Pursuant to Single-Trigger Arrangements ($) | Cash Payable Pursuant to Double-Trigger Arrangements ($) |
|---|---|---|
| Rory J. Cowan | 639,404 | 3,866,301 |
| Marc Litz | 141,741 | 688,253 |
| Marc Osofsky | 126,285 | 802,603 |
| Paula Shannon | 136,192 | 789,863 |
| Richard Tobin | 200,869 | 891,781 |

52.    Furthermore, five of the nine Board members were also conflicted by their longstanding relationships with Cowan or the Company.  At the time of Lionbridge's 1999 IPO, de Chazal was a member of the Company's then six-member board of directors and was

- 15 -

with Morgan Stanley Dean Witter Venture Capital, owner of 33.4% of the Company's outstanding shares.  At the time, Cowan owned 18.4% of Lionbridge's outstanding shares.  Cowan and de Chazal therefore could and did elect all of the other directors at the time, including current Board members Kavanaugh and Sheer.  On July 12, 2016, the Company – led by the Cowan and de Chazal dominated Board – announced the appointment of Kantor to the Lionbridge Board.  Most recently, Kantor served as a National Advisory Partner at PricewaterhouseCoopers, which had been Lionbridge's auditor for over 18 years.

53.     While Lionbridge's stockholders were cut out of the picture, the Company's management stayed on board after the transaction even as they cashed in their illiquid holdings for lucrative payouts.  As Cowan told Company employees following the announcement of the Merger: "There will be very few changes.  I will remain as CEO and management, of course, will remain in place."  Consequently, in being retained by HIG, Lionbridge's management got the best of both worlds:  they could cash in or roll over their equity holdings, but also remain in their positions without being subject to the hassles and filing requirements of running a publicly traded company.  In essence, the Merger was a management buyout, backed by HIG.

54.     Finally, the Board retained a conflicted financial advisor.  During the two-year period before the date of the Merger Agreement, Union Square had provided financial advisory services to the Company (other than in connection with the proposed merger with HIG) and received a fee of approximately $1 million for those services.  Cowan was responsible for those engagements of Union Square, and Union Square had every incentive to maintain that strong relationship with Cowan going forward to secure future paydays.  During the same two-year period, Union Square has provided financial advisory services to HIG in connection with an unrelated acquisition transaction and received fees for these

services of approximately $2 million.   Again, Union Square had a strong incentive to maintain its relationship with HIG after the Merger.

55.     Union Square was also conflicted by the form of compensation it received for advising the Committee.   In return for serving as a financial advisor to the Board and rendering a fairness opinion, Union Square received a fee for its services of approximately $4.5 million, $600,000 of which was paid upon delivery of Union Square's opinion and the remainder of which was payable only upon the closing of the Merger.   Union Square was completely incentivized by the contingent nature of the fee to render, as it did, a favorable fairness opinion that the merger consideration was fair to Lionbridge's public stockholders.

## THE COMPANY'S ACQUISITION-BASED GROWTH STRATEGY

56.     Before, during, and after the Merger process, a core part of Lionbridge's business strategy was to achieve significant growth through acquisitions of other companies. As the Company explained in its annual report for the year ended December 31, 2015, "Lionbridge has pursued an aggressive acquisition strategy since 2012 to expand and complement its service offerings and customer base."   Lionbridge also told investors in its annual report that "[w]e expect to continue making acquisitions as part of our long-term business strategy."   Defendants Cowan and Litz signed certifications to the annual report, attesting that they had reviewed the annual report and it did not contain any materially untrue statements or omissions.

57.     In 2015, Lionbridge completed two significant acquisitions.   First, it acquired CLS Communication, a Switzerland-based privately held translation company focused on the financial services, industrial, and government markets.   Later in the year, it acquired Geotext Translations, Inc., a privately held provider of legal translation services.   Both acquisitions

were presented as significantly expanding Lionbridge's capabilities and accelerating its growth.

58.     In November 2015, Lionbridge announced a $50 million share repurchase program, which defendant Cowan described as "underscoring our ongoing confidence in the long-term financial success of Lionbridge and our commitment to increase shareholder value." At the same time, Cowan stressed that Lionbridge would also "continue to use our capital to fund growth, both organically and by acquisitions" and that "we believe Lionbridge is well positioned to proceed with both acquisitions and share repurchases while maintaining our leverage at a reasonable level." As Lionbridge's then-Vice President, Finance Marc Litz told investors and analysts on a conference call, Lionbridge still "expect[ed] to have ample flexibility to fund additional tuck-in acquisitions as appropriate" and would "continue to manage our capital to . . . fund growth." On that same call, Cowan trumpeted Geotext as just one "example" of Lionbridge "executing on [its] strategy of moving upstream to new buyers and over to new additional vertical markets" as well as "diversifying outside of our core [tech] sector with both organic growth and acquisitions in the new verticals."

59.     Lionbridge continued with the same strategy into 2016, with Cowan telling investors and analysts in a February 2016 conference call that the Company was still "using [its] capital to support . . . strategic tuck-in acquisitions." In a July 2016 press release announcing Kantor's appointment to the Board, she hailed her anticipation that the Company would continue to "'evolve[] and broaden[] across new verticals, new markets and new channels.'"

60.     In the first half of 2016, Lionbridge completed a major reorganization for the stated purpose of facilitating its strategy of growing through acquisitions. Lionbridge had

historically been "organized functionally," into "[g]lobal sales, global operations, [and] global technology" organizations.  As Cowan told investors and analysts in August 2016, however, this type of "functional org[anization]" does not "scale."  To address that inability to rapidly increase the size of the Company using its existing structure, Lionbridge effected a major reorganization.  Operations were rearranged into nine "Strategic Business Units," with "senior leaders or general managers responsible for the full P&L from revenue, all the way down to a net income or to profit."  Cowan described the reorganized structure as a "structure for an effective, targeted acquisition strategy," which meant that Lionbridge now had "places where [it could] plug in the smaller acquisitions, and they can report to a GM for faster integration that really aligns offerings, cost models and cultures."  Cowan told investors and analysts that these changes were made so that Lionbridge could get "to the $1 billion . . . level over the coming years."

61.  Further showing that acquisition-based growth was central to the Company's strategy, the Board repeatedly discussed the Company's "ability to access capital to fund acquisitions" during the sales process.  For example, that topic was one of the issues purportedly discussed at the January 28 and 29, 2016 Board meeting at which the Board was "supportive of management continuing to engage in preliminary and introductory discussions with the various parties who had expressed general interest in a potential strategic transaction."  "[A]ccess to capital to fund acquisitions" was also a factor the Board discussed at its regularly scheduled April 27 and 28, 2016 meeting, at which Cowan presented preliminary financial projections and the Board authorized management to engage in preliminary discussions with HIG.  At that same meeting, in discussing the Company's "long-range plan and prospects," the Board also discussed "business development opportunities" which, especially because they were contrasted with "organic growth . . .

opportunities," was clearly a reference to the Company's strategy of growing through acquisitions.

62.     Once the Special Committee was formed, it discussed both the Company's "access to capital to fund acquisitions" and its "long-range plan" including "business development opportunities" at its July 14, 2016 meeting, where it decided to "continue to respond to the inquiries of the various interested parties to assess their interest in a potential acquisition of Lionbridge" and instructed Mr. de Chazal to contact potential financial advisors.  The Special Committee discussed the Company's "access to capital to fund acquisitions" and its "business development opportunities" again at meetings on August 11 and October 19, 2016, in connection with its decision to explore a sale process with HIG and with four other parties but not to contact other potential acquirors, and its decision not to contact HIG in an attempt to pressure it to finalize a complete and firm bid.

63.     On October 27, 2016, the full Board discussed the Company's "access to capital to fund acquisitions" and its "business development opportunities" in connection with the Board's decision to attempt to pressure HIG and "Party D" to submit a final bid by telling them that management's focus would return to executing the Company's "long-term strategic plan."  In approving and recommending the Merger, the Board again cited "risks to our business . . . including our ability to grow organically and through business development opportunities" as one of the "Reasons for the Merger and Recommendation of our Board of Directors."

64.     After the Merger was announced, Lionbridge continued to plan for significant growth through acquisitions.  Within a week after announcing the Merger, Cowan told a journalist from *Slator* that, after the Merger, Lionbridge was "'absolutely'" going to participate very actively in M&A.  Cowan stressed that, as a private company, Lionbridge's

ability to lever up its balance sheet would be enhanced.  Cowan opined that the language services industry was '"entering an era of industry consolidation, as it bifurcates into very small local players and very large global players, and as in every other industry that mid-range tends to get hollowed out.'"  Accordingly, he made a pitch to mid-sized language service providers that they should consider '"selling to a larger player that has already brought professional management, professional technology, and has global offices,'" like Lionbridge.

65.     Confirming that the Company's acquisition-based growth strategy had not changed, Cowan told employees after the Merger was announced that the Company's strategy would not significantly change:  "[R]ather than having multiple investors, we will have a single investor.  We'll no longer be in the public markets.  We plan to operate substantially as we do today.  There will be very few changes.  I will remain as CEO and management, of course, will remain in place."

66.     Further confirming that the Company intended to continue pursuing growth through acquisitions, it was just *three days* after the Merger closed that the now HIG-owned Lionbridge announced its next acquisition.  On March 3, 2017, the Company announced the acquisition of Exequo, a privately-held audio production, translation and localization company that specializes in global video game services, with studios in five countries.  Although terms of the transaction were not disclosed, market observers noted that this strengthened Lionbridge's position to compete in the video game localization market, where the "much smaller" Keywords Studios had achieved a market capitalization of over $400 million on the London Stock Exchange.  Lionbridge's Vice President of Corporate Development and Investor Relations stressed in an interview with *Slator* that the deal "underscores H.I.G.'s support of Lionbridge's growth strategy."

67.     Given that it takes months for a transaction like this to be negotiated, approved, and consummated, it is clear that the Individual Defendants knew of the planned acquisition and had a concrete plan to proceed with it well before the Merger was completed, and before the Proxy Statement was filed with the SEC.  Nonetheless, stockholders were told nothing about this acquisition in the Proxy Statement and (on information and belief based on the fact that such a significant acquisition would have drastically increased the projected growth rates, at least as to revenues) it was not reflected in the management projections that were disclosed.

68.     In July 2017, Cowan again confirmed that Lionbridge was still planning to grow through acquisitions.   In an interview with *Slator*, Cowan was asked about Lionbridge's future mergers and acquisitions strategy.  He said that the first six months since the Company's acquisition had gone very well and that now "of course they [HIG] want to put their money to work."  He continued:  "We are looking at a lot of companies.  The phones are ringing right now.  Because what we are seeing is that a lot of firms on one side are excited about the next leg of growth but they are sort of frightened by the technology changes and the capricious nature of some of the larger buyers here in the industry."  Cowan also explained that the Company had hired a new CEO (while Cowan would remain intimately involved with the Company as Chairman of the Board) who was selected on the basis that, while existing executives were good at "running the business," the post-Merger Lionbridge needed someone to "run the corporation" because "there is an acquisition strategy going on."

### DEFENDANTS' OMISSIONS AND MATERIALLY MISLEADING STATEMENTS ABOUT THE FINANCIAL PROJECTIONS

69.     On January 31, 2017, Lionbridge filed the Proxy Statement with the SEC. The primary message of the Proxy Statement was, as defendant Cowan explained in his

cover letter to the Proxy Statement, and as was repeated in bold all-capital print in the notice

of the special meeting of stockholders and again multiple times in the body of the Proxy

Statement, that "[t]he members of [Lionbridge's] Board of Directors voting on the matter

unanimously recommend that you vote 'FOR' the adoption of the merger agreement."  In

advocating for the Merger, however, the Proxy Statement materially misled Lionbridge

stockholders, making the Merger seem more attractive than it really was.

70.     On pages 52-54 of the Proxy Statement, defendants disclosed what they

described as management financial projections.  The projections were described as "forecasts

and assumptions for certain periods between 2016 and 2020" that "were developed under the

assumption of continued standalone operation as a publicly-traded company and did not give

effect to any changes or expenses as a result of the merger or any effects of the merger."  The

projections included forecasts prepared by Lionbridge's management, including Cowan, for

the full fiscal years 2016 and 2017, and "extrapolated projections for calendar years 2018

through 2020," which were prepared by the Company's financial advisors at Union Square

and then "approved for use by senior management."  Collectively, defendants referred to the

management-generated forecasts and the Union Square-generated extrapolations as the

"Management Case" in the Proxy Statement.

71.     The projections disclosed in the Proxy Statement were as follows:

| | 2016 Forecast | | 2017 Projection | | 2018 Projection | | 2019 Projection | | 2020 Projection |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | $ | 550.5 | $ | 572.0 | $ | 606.5* | $ | 623.6* | $ | 641.2* |
| Adjusted EBITDA[] | $ | 50.1 | $ | 60.1 | $ | 69.7* | $ | 75.5* | $ | 81.4* |
| GAAP Income from Operations | $ | 22.2 | $ | 32.7 | $ | 43.2* | $ | 49.6* | $ | 56.0* |
| Unlevered Free Cash Flow[] | $ | 16.6 | $ | 20.4 | $ | 30.6* | $ | 34.3* | $ | 38.3* |

72.     As the table above shows, the projections contemplated that, over four years,

the Company's revenues would grow from $550.5 million to $641.2, reflecting a compound

annual growth rate of less than 3.9%. By contrast, over the four years from 2011 to 2015, the Company had experienced compound annual revenue growth of nearly 7%. As recently as November 8, 2016, Lionbridge had provided the market a preliminary outlook for fiscal year 2017 with estimated year-on-year revenue growth of 4%-6% "with opportunities for upside," and double-digit year-on-year Adjusted EBITDA growth. Perhaps unsurprisingly, 2017 was a strong year for Lionbridge – much stronger than defendants implied it would be through their disclosed projections. Whereas the disclosed projections estimated that 2017 revenue would be $572 million, the Company actually closed 2017 "just short of USD 600m in revenues." This included 16% growth in the fourth quarter – a far cry from the annual growth rate of 3.9% shown in the disclosed projections.

73.     Less than a year before the Merger was announced, Cowan had publicly discussed his intention to make Lionbridge a $1 billion company in the near future, largely through acquisitions. The Merger, however, valued the Company at barely more than a third of that, meaning the acquisition-based growth strategy was expected to nearly triple the size of the Company. The management projections that were disclosed, because they do not reflect growth through acquisitions, are inconsistent with that strategy and with the resulting growth.

**The Proxy Statement Omitted a Key Fact that Defendants Have Now Admitted: The Projections Excluded Acquisition-Based Growth**

74.     As explained above, it is evident that the disclosed projections do not reflect continuation of Lionbridge's acquisition-driven growth strategy. If there were any doubt, however, Defendants cleared it up in briefing their motion to dismiss Plaintiff's initial Amended Complaint for Violation of the Securities Laws. In their opening brief, Defendants admitted that the projections "did not include opportunities for upside such as acquisitions."

In their reply brief, Defendants again conceded that "the forecasts did not include future acquisitions."

75.    The Proxy Statement omitted this key fact.  Nowhere in the Proxy Statement does it say that the disclosed projections exclude the effect of acquisitions, or exclude the effect of acquisitions not yet specifically identified or announced, or provide any similar explanation of the exclusion.  It would have been simple for the Proxy Statement to include such an explanation, and indeed it is common for merger-related proxy statements to explain precisely this issue when they rely on projections that exclude acquisitions.  For example, recent proxy statements in connection with proposed mergers, when relying on projections that excluded acquisitions, have made statements like the following: "Prospective mergers and acquisitions were excluded from the financial projections"; "[I]n connection with the proposed transaction, certain non-public, unaudited financial projections regarding [the company's] anticipated results of operations for fiscal years 2017 through 2021 excluding the results of projected acquisitions were provided to the [board, financial advisor, and counterparty]"; "[The financial advisor] calculated [the company's] unlevered free cash flow for 2018 through 2021 using the [company's] projections (excluding unidentified acquisitions)"; "The [company's] management forecasts reflect various assumptions and estimates . . . , including, without limitation: . . . no acquisitions are undertaken, other than those communicated pre-merger announcement."  No such statement appears in the Proxy Statement.

**Defendants' Omission Rendered the Proxy's Statements About the Projections Materially Misleading**

76.    The omission of the fact that the disclosed projections assumed a drastic departure from the Company's actual business strategy, *i.e.*, that the Company would make no acquisitions, made several statements in the Proxy Statement materially misleading.

- 25 -

77.    *First*, the omission of the fact that the disclosed projections excluded acquisitions rendered materially misleading the Board's recommendation that shareholders vote in favor of the Acquisition and the purported basis for that recommendation.  As noted above, the Proxy Statement conveyed the "unanimous[] recommend[ation]" of the voting members of the Board that stockholders vote in favor of the Merger.  The Proxy Statement informed stockholders that "[i]n arriving at its recommendation, our Board of Directors carefully considered a number of factors."  It continued:  "For the factors considered by the members of our Board of Directors voting on the matter in reaching their decision to approve the merger agreement, see '*The Merger—Reasons for the Merger and Recommendation of our Board of Directors*' beginning on page 39 of this proxy statement."  That section, in turn, explained that:  "During the course of its deliberations on [the] merger, the Special Committee . . . reviewed, evaluated and considered . . . , together with our full Board of Directors, . . . our business and financial prospects if [Lionbridge] were to remain an independent, publicly-traded company  .  .  .  , including forecasts of future financial performance set forth in the [disclosed projections]."

78.    This statement was misleading because it told the reasonable shareholder that the disclosed projections were (and/or the Board believed they were) representative of the Company's actual "business and financial prospects if [it] were to remain an independent, publicly-traded company."  Because the Proxy Statement omitted the fact that the disclosed projections did not reflect the Company's actual plans or prospects, and instead excluded acquisition-based growth, this statement was materially misleading.

79.    *Second*, the omission of the fact that the disclosed projections excluded acquisitions rendered misleading Union Square's fairness opinion and the Board's reliance on that fairness opinion.  The Proxy Statement represented that:  "In reaching its decision to

approve the merger agreement, including the merger, and to recommend that the Lionbridge stockholders vote in favor or [*sic*] approval of the merger agreement[], our Board of Directors and the Special Committee determined that the following were positive reasons to support the merger agreement: . . . certain financial analyses presented to our Board of Directors by Union Square and the oral opinion of Union Square, subsequently confirmed in writing, that . . . the merger consideration to be received by the holders of shares of our common stock (other than Excluded Shares) pursuant to the merger agreement was fair, from a financial point of view, to such holders."   The Proxy Statement further represented that, in reaching that opinion, Union Square had "used and relied upon" the disclosed projections, and that Union Square had "assumed and relied upon . . . the accuracy and completeness of the information . . . supplied or otherwise made available to . . . Union Square" and "further relied upon the assurances of the Company's management that they were not aware of any facts that would make such information inaccurate or misleading."   The Proxy Statement also stated that "Union Square assumed that [the] financial forecasts were reasonably prepared on a basis reflecting the best currently available estimates and good faith judgments of management as to the future competitive, operating and regulatory environments and related financial performance of the Company."

80.     These statements were misleading because they told the reasonable investor that the Board viewed the disclosed projections as reasonable and reliable for valuation purposes, and that Lionbridge's management had provided explicit assurances that they were unaware of any facts making the projections misleading.   Because the Proxy Statement omitted the fact that the disclosed projections excluded a crucial part of the Company's actual business strategy (and the Company's officers and directors knew that fact), these statements were materially misleading.

81.    ***Third***, the omission of the fact that the disclosed projections excluded acquisitions rendered misleading the Proxy Statement's representation that the Board had compared the value available in the Merger to the future value of the Company based on both organic and acquisition-driven growth.  The Proxy Statement cited, as a "positive reason to support the merger," the Board's "belief . . . that the consideration of $5.75 per share to be received by the Lionbridge stockholders in the merger provides greater certainty of value and less risk to such stockholders relative to the potential trading price of the shares over the long-term after accounting for[, among other things, Lionbridge's] ability to grow organically ***and through business development opportunities***."  This statement was misleading because it implied to the reasonable investor that the disclosed projections, and Union Square's valuation analyses based on those projections, reflected Lionbridge's ability to grow "through business development opportunities."  Because the Proxy Statement omitted the fact that the disclosed projections did not reflect acquisition-driven growth, that statement was materially misleading.

82.    ***Fourth***, the omission of the fact that the disclosed projections excluded acquisitions rendered misleading the Proxy Statement's representation that the disclosed "forecasts . . . were developed under the assumption of continued standalone operation as a publicly-traded company and did not give effect to any changes or expenses as a result of the merger or any effects of the merger."  A reasonable investor would have understood, from this statement, that the disclosed projections reflected "***continued*** standalone operation as a publicly-traded company" and did not reflect a fundamental change in the Company's business strategy.  But in reality, the disclosed projections did reflect just such a fundamental change – a change from acquisition-driven growth to muddling along without making

acquisitions.  Because the Proxy Statement omitted that fact, this statement was materially misleading.

83.    **Fifth**, the Proxy Statement's omission of the fact that the disclosed projections excluded acquisitions rendered misleading the Proxy Statement's implication that the disclosed projections reflected management's honest judgments with respect to future business conditions and strategies.  The Proxy Statement stated:

> The forecasts, including the December Projections, while presented with numerical specificity, were based on numerous variables and *assumptions that necessarily involve judgments with respect to, among other things, future economic, competitive and regulatory conditions* and financial market conditions, all of which are difficult or impossible to predict and many of which are beyond our control. The forecasts also reflect *assumptions as to certain business decisions that are subject to change* and reflect certain assumptions regarding demand from our large client accounts. Important factors that may affect actual results and the achievability of the projections include, but are not limited to, risks and uncertainties pertaining to our business, including those risk and uncertainties described in our Annual Report on Form 10-K for the fiscal year ended December 31, 2015, subsequent quarterly reports on Form 10-Q and current reports on Form 8-K. In addition, *the forecasts may be affected by our ability to achieve strategic goals*, objectives and targets over the applicable period.

This statement implied to the reasonable shareholder that the forecasts  (a) were based on management's honest, good-faith judgments with respect to future economic, competitive and regulatory conditions, (b) reflected management's honest, good-faith assumptions as to anticipated future business decisions, and (c) reflected the Company's actual strategic goals. Because the Proxy Statement omitted the fact that the disclosed projections did not reflect the Company's actual strategy for growth, this statement was materially misleading.

84.    **Sixth**, the Proxy Statement's omission of the fact that the disclosed projections excluded acquisitions rendered misleading the Proxy Statement's contrary implication that the projections reflected anticipated future transactions or events. The Proxy Statement told shareholders that "[t]he forecasts . . . reflect assumptions that are subject to

change and are susceptible to multiple interpretations and periodic revisions based on actual results, revised prospects for our business, changes in general business or economic conditions, or any other transaction or event that has occurred or that may occur and that ***was not anticipated when the forecasts were prepared***." A reasonable shareholder would, thus, have understood the disclosed projections to reflect conditions, transactions, or events that were anticipated when they were prepared – like Lionbridge's strategy for growth. Because the Proxy Statement omitted the fact that the disclosed projections did not include the Company's anticipated acquisition-based growth strategy, this statement was materially misleading.

**The Proxy's Statements of Fact About the Projections Were Material**

85.     When investors are asked to consider whether to approve or reject a proposed cash-out merger, the choice boils down to one question:  Is the cash value on offer more or less than the expected value of remaining a shareholder and continuing to receive a share of the Company's future earnings?  In making this determination, management's estimate of the Company's future returns has been described by courts as "probably among the most highly prized disclosures by investors" and as "clearly material information."

86.     In the Proxy Statement, Defendants at least implicitly acknowledged the materiality of the projections.  First, at least three separate bullet-point paragraphs in the section entitled "Reasons for the Merger and Recommendation of our Board of Directors" directly or indirectly relied upon the disclosed projections in support of the Merger.  Second, the Proxy Statement stated that the disclosed projections were included "to give the Lionbridge stockholders access to certain financial projections that were made available to the Special Committee, our Board of Directors and Union Square."  This statement was an acknowledgment that, because the projections were relied upon by the Board and Union

Square in their analysis of and recommendation of the Merger, the projections would be important to shareholders (and would be considered material under Delaware law, which applies the same standard of materiality as under federal law).

87.     Because the management projections were – or at least would have been if they were reliable – among the most important pieces of data in the Proxy Statement, statements relating to the reliability of those projections were highly material to shareholders considering whether to vote in favor of the Merger.

**The Misleading Projections and Related Statements Caused Plaintiff Losses by Misleading Shareholders Into Approving the Merger at an Inadequate Price**

88.     The misleading statements and omissions regarding the pessimistic projections, in turn, caused shareholders to believe that the Merger was more attractive, relative to Lionbridge remaining independent, than it truly was, and thus caused them to mistakenly approve the Merger.   The low-growth projections enabled Union Square to perform financial analyses, based on the projections, that implied that the Merger price of $5.75 per share was within the range of fairness.   This, despite the facts that the $5.75 per share Merger consideration represented a premium of only 3.20% based on Lionbridge's closing price on December 9, 2016.   This premium was significantly below the average one-day premium of nearly 38.96% for comparable transactions within the three years preceding the Merger.   Further, the $5.75 merger consideration was significantly below the target price of $7.00 set by an analyst at Barrington Research on May 9, 2016, the target price of $6.50 set by an analyst at Craig-Hallum Capital Group LLC on November 8, 2016, and the target price of $6.35 set by an analyst at Noble Financial Group on May 6, 2016. In the three years before the Merger, Lionbridge stock traded as high as $7.50 per share on February 26, 2014, and traded above the Merger consideration – at $5.89 per share – as recently as November 9, 2015.

89.     Had Union Square used projections that were consistent with the Company's actual strategy of growing through significant acquisitions, it likely would not have been able to opine that the Merger price was fair and, even if it did so opine, stockholders would not have been convinced and would not have supported the Merger.

## COUNT I

### Against All Defendants
### for Violations of §14(a) of the 1934 Act
### and SEC Rule 14a-9 Promulgated Thereunder

90.     Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

91.     SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

92.     Defendants prepared, reviewed and/or disseminated the misleading Proxy Statement which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

93.     As stated herein, the Proxy Statement contained untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder, and the Proxy Statement was an essential link in the consummation of the Merger.  Defendants have also failed to correct the Proxy Statement and the failure to update

and correct misleading statements is also a violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

94.     The written communications made by defendants described herein constitute violations of Rule 14a-9 and §14(a) because such communications are materially misleading and were provided in at least a negligent manner.

95.     As a direct result of defendants' negligent preparation, review and dissemination of the misleading Proxy Statement, plaintiff and the class were precluded both from exercising their right to seek appraisal and were induced to vote their shares and accept inadequate consideration of $5.75 per share in connection with the Merger. The misleading Proxy Statement used to obtain stockholder approval of the Merger deprived plaintiff and the class of their right to a fully informed stockholder vote in connection therewith and the full and fair value for their Lionbridge shares. At all times relevant to the dissemination of the materially misleading Proxy Statement, defendants were aware of and/or had access to the true facts concerning Lionbridge's acquisition-based growth strategy, which was not reflected in the management projections that were disclosed in the Proxy Statement, and thus were aware that their statements about those projections were misleading. Also as a result, defendants were aware that Lionbridge's true value was materially higher than indicated in Union Square's financial analyses based on those projections and materially higher than the $5.75 per share that Lionbridge's stockholders received in the Merger. Thus, as a direct and proximate result of the dissemination of the misleading Proxy Statement defendants used to obtain stockholder approval of and thereby consummate the Merger, plaintiff and the class have suffered damage and actual economic losses (*i.e.*, the difference between the price Lionbridge stockholders received and Lionbridge's true value at the time of the Merger) in an amount to be determined at trial.

96.     The omissions and misleading statements in the Proxy Statement are material in that a reasonable stockholder would have considered them important in deciding how to vote on the Merger.  In addition, a reasonable investor would view a full and accurate disclosure as having significantly altered the "total mix" of information made available in the Proxy Statement and in other information reasonably available to stockholders.

97.     By reason of the misconduct detailed herein, the defendants are liable pursuant to §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

## COUNT II

### Against the Individual Defendants and the Buyer Defendants
### for Violation of §20(a) of the 1934 Act

98.     Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

99.     The Individual Defendants acted as controlling persons of Lionbridge within the meaning of §20(a) of the 1934 Act.

(a)     By virtue of their positions as officers and/or directors and/or controlling stockholders of Lionbridge, and/or their participation in and/or awareness of the Company's operations and/or intimate knowledge of the misleading statements contained in the Proxy Statement filed with the SEC, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are misleading.

(b)     Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by plaintiff to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

(c)     The Proxy Statement details the Individual Defendants' involvement in negotiating, reviewing and approving the Merger and preparation of the Proxy Statement.

(d)     The Proxy Statement contains the unanimous recommendation of each of the Individual Defendants to approve the Merger.  They were thus directly involved in the making of this document.

(e)     By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the 1934 Act.

100.    The Buyer Defendants are a controlling person of Lionbridge and the Individual Defendants within the meaning of §20(a) of the 1934 Act.  By reason of their contractual rights and obligations with respect to Lionbridge, the Individual Defendants, and defendant Cowan in particular, the Buyer Defendants possessed control over Lionbridge and the Individual Defendants.

(a)     Lionbridge and the Individual Defendants were required by §6.01 of the Merger Agreement to refrain from changing the operation of the Company's business or engaging in a variety of activities without the express written consent of the Buyer Defendants.

(b)     Pursuant to §6.04(a) of the Merger Agreement, Lionbridge was not permitted to change the record date for the stockholder meeting on the Merger without the Buyer Defendants' prior written consent.

(c)     Pursuant to §6.04(b) of the Merger Agreement, the Buyer Defendants were required to, and did, "cooperate with the Company in connection with the preparation and filing of the Proxy Statement, including as promptly as practicable furnishing to the Company in writing upon request any and all information relating to it as may be required to be set forth in the Proxy Statement under Applicable Law."  HIG also promised to

ensure that such information supplied by it in writing for inclusion in the Proxy Statement will not, on the date it is first mailed to stockholders of the Company and at the time of the Stockholder Meeting or filed with the SEC (as applicable), contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they are made, not false or misleading.

HIG also explicitly required that, "prior to filing or mailing the Proxy Statement or any other required filings (any amendment or supplement thereto), or responding to any comments of the SEC with respect thereto, the Company shall provide Parent and its counsel with a reasonable opportunity to review and comment on such document or response and shall consider Parent's comments in good faith."

101.    By reason of such conduct, the Buyer Defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Declaring that the Proxy Statement distributed by defendants to stockholders was materially misleading, in violation of Rule 14a-9 and §14(a) of the 1934 Act;

C.    Awarding plaintiff and the members of the Class compensatory and/or rescissory damages against the defendants;

D.    Awarding plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs;

E.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, and any appropriate state law remedies; and

F.      Awarding such other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

**ANDREWS & SPRINGER LLC**

By: /s/ *Peter B. Andrews*
Peter B. Andrews (#4623)
Craig J. Springer (#5529)
David M. Sborz (#6203)
3801 Kennett Pike Building C, Suite 305
Wilmington, DE  19807
Telephone:  302/504-4957
302/397-2681 (fax)
Email:  pandrews@andrewsspringer.com
           cspringer@andrewsspringer.com
           dsborz@andrewsspringer.com

**OF COUNSEL**:                            *Local Counsel*

**ROBBINS GELLER RUDMAN
    & DOWD LLP**
Randall J. Baron
David T. Wissbroecker
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

**ROBBINS GELLER RUDMAN
    & DOWD LLP**
Christopher H. Lyons (#5493)
414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2203
615/252-3798 (fax)

*Lead Counsel for Plaintiff*

**CAVANAGH & O'HARA**
Patrick J. O'Hara
2319 West Jefferson Street
Springfield, IL  62702
Telephone:  217/544-1771
217/544-9894 (fax)

*Additional Counsel for Plaintiff*

DATED:  May 11, 2018